**Pages 1 - 31**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

DRONE LABS, LLC,                     )
                                     )
          Plaintiff,                 )
                                     )
   VS.                               )      **NO. C 19-01281 EMC**
                                     )
DEDRONE HOLDINGS, INC.,              )
                                     )
          Defendant.                 )
                                     )

                         San Francisco, California
                          Tuesday, June 4, 2019

                 **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    BUTCH BOYD LAW FIRM, P.C.
                    2905 Sackett Street
                    Houston, TX  77098
               BY:  **ROBERT D. GARZA, ATTORNEY AT LAW**

                    LAW OFFICE OF MARIO A. MOYA
                    1300 Clay Street, Suite 600
                    Oakland, CA  94612
               BY:  **MARIO A. MOYA, ATTORNEY AT LAW**

For Defendant:
                    FEINBERG DAY KRAMER ALBERTI LIM
                    TONKOVICH & BELLOLI
                    1600 El Camino Real - Suite 280
                    Menlo Park, California  94025
               BY:  **MARC C. BELLOLI, ATTORNEY AT LAW**
                    **JEREMIAH A. ARMSTRONG, ATTORNEY AT LAW**

Reported By:        Marla F. Knox, RPR, CRR
                    Official Reporter

**Tuesday - June 4, 2019**                                    **11:46 a.m.**

                    **P R O C E E D I N G S**

                          **---oOo---**

          **THE CLERK:**  Calling civil action 19-1281, Drone Labs,
LLC versus Dedrone Holdings, Inc.

     Counsel, please state your appearances for the record.

          **MR. GARZA:**  Daniel Garza for the Plaintiffs Drone Labs
along with my co-counsel, Mario Moya.

          **MR. BELLOLI:**  Good morning, Mark Belloli with my
colleague Jeremiah Armstrong for the Defendant Dedrone
Holdings, Inc.

          **THE COURT:**  All right.  Thank you, Mr. Belloli.

     Let's address the issue that has been raised by the motion
to dismiss, first of all, the issue of direct infringement and
whether or not the accused device is alleged to have -- to
determine a compass position of the drone and recalculate the
updated threat level.

     The wording itself of the FAC don't seem to be that clear.
It does talk about including information such as distance,
location, speed, altitude and other captured data; but it
doesn't really say how that is determined and whether that is
updated.  I understand that it has cited some You Tube video to
suggest that the Defendant's product does have these functions
localized plot on a map, et cetera, et cetera.  It seems to me
that if that's the case, why not allege it?  Why shouldn't this

be dismissed with leave to amend and you allege with greater specificity that the elements are satisfied here?

MR. GARZA:  Well, Your Honor, we believe that in paragraph -- I believe you cited in paragraph 44 in our amended complaint -- it did capture that in broad terms so as to, you know, describe what we can using video exhibits which is difficult in Word; but we wanted to make sure that we captured everything possible within that allegation.

THE COURT:  But you now have more information.  You could be more specific, couldn't you?

MR. GARZA:  Without -- you know, with the public material available, Your Honor, yes, we could.  This would be, you know, the videos which we have already cited and the manuals.  To the extent that the source code of Defendant's products -- actually how and they use the compass position -- we don't know that at this point without --

THE COURT:  Right, right.  And even under *Iqbal Twombly*, I don't think you are required to verify by source code analysis; but certainly the functions and the elements of the claim ought to be alleged with some degree of specificity.

MR. GARZA:  Correct, Your Honor.  I mean, you know, Your Honor, if you believe that we need to allege that a little more specifically, again, we request leave to amend if necessary.  But, you know, prior to filing the first amended complaint, we tried to address Defendant's concerns in their

original motion to dismiss; but this is how we drafted it, and I believe that it captured everything.  But if Your Honor would like more specific allegations in this complaint, we would be happy to amend.

THE COURT:  Let me ask -- looking ahead, is there going to be much dispute that the accused product, in fact, determines the compass position?

MR. BELLOLI:  That there is a compass heading, there may not be dispute as to that; but, again, the term is recalculating updated threat level based on the compass position.

As Your Honor very acutely or very -- put it very perfectly, all they have alleged is that it plots where this drone is on a map, okay.  And it doesn't use speed, altitude or compass position -- the products -- to recalculate what they are calling the updated threat level.  It flat out doesn't do this.  We have told them this, and that's why with leave to amend, I don't know how they are going to point to anything that makes a plausible allegation that what they are calling in the complaint the threat level is recalculated based on compass position; i.e. --

THE COURT:  So based on compass position that is key to that?

MR. BELLOLI:  Yeah, because what is going on here is, the second half of this claim is -- so the first half of the

claim you have got this determining of base threat level, and then the second half of the claim after the counter, you have three recalculations that go on.

First is based on identifying information from the drone. We don't think that they have alleged that well either, but we are just focused on the compass position for purposes of this motion because they don't touch on that at all.

So you have to get identifying information from the drone and calculate an updated threat level.

Then, you have to receive position information which includes distance, location, speed and altitude and, again, recalculate the updated threat level on that position information.

Then, you have to determine the compass position of the drone; i.e, the compass direction -- which I think they seem to concede that's what that means, the compass direction -- and, again, recalculate the updated threat level based on the compassion position.

These products I can unequivocally state do not use speed, altitude or compass position as a determination of what they are calling the threat level; i.e, when it goes into that localized plot on a map that Your Honor noted and says Warning, there is a drone -- they don't use those things to calculate or recalculate a threat level or an updated threat level.  And it's telling when they ask for leave and when they say, Well,

we don't really know what is going on with the code.  It is because the products don't do that; and that's why --

THE COURT:  You said it uses neither speed, altitude or direction?

MR. BELLOLI:  Or direction to calculate the threat level.  It can measure these things, but you have to use those things to recalculate an updated threat level.

THE COURT:  Is there an updated threat level provided in the accused product?

MR. BELLOLI:  No.  If it goes in the zone -- goes in that box, threat level on.  If it goes out, threat level off. And that's --

THE COURT:  So it is a binary?

DEFENSE COUNSEL:  Pretty much; but speed, altitude and compass position aren't used.  For example, using that plot that Your Honor talked about, drone flies in.  Drone can start doing 360s, and it is doing all 360-degree compass directions; and there is no change in the threat level.  It could be outside the zone doing spinning circles in the same place, and there is no change or update to the threat level.  And in the source code for these it is clear what goes into whether it says threat on or off.  It is not speed.  It is not altitude, and it is not compass position; and that's why if Your Honor gives leave to amend, there is not going to be anything that they can point to plausibly allege this.

THE COURT:  What does compass position mean in the claim language here, direction?

MR. GARZA:  Broadly, Your Honor, yeah, we are referring to the direction in whether it is incoming or outgoing, the drone, relative to the position that is being --

THE COURT:  Does it give direction in terms of north, south, southwest?

MR. GARZA:  Broadly speaking, Your Honor.  Contrary to what Defense counsel says, I think -- the video that is screen-shot Exhibit T to our amended complaint, I think, is actually a pretty good determination -- description of how the area is monitored.

There is actually two boxes in there.  There is a light blue box, an inner red box; and then you have the surrounding area.  As a drone -- if you are able to watch the video -- flies around the area.  It is actually caught using a little dot.  When it enters into the blue area, the user is alerted. When it enters into the red area -- which is another monitored area -- the user is again alerted that it is even closer.  And at that point if you see those little blue circles, you can employ countermeasures if you wish to with their technology. And based on the video and the -- what is made available, it is apparent that the drone is being tracked from whatever direction it is coming in because it also has to be plotted for the user to visually see where the drone is at, and then the

system will employ countermeasures of the user whether it is within a certain area or whatnot.

Also, if the drone leaves a certain area, a counter -- if I remember this correctly, there is a counter that is displayed to the user; and the threat level will eventually lower once the drone has exited the monitor area.

THE COURT:  It depends on which area -- which zone they are in.

MR. GARZA:  Correct.

THE COURT:  His argument is that it tells you one thing.  It doesn't tell you the direction it is moving.  So that even if it is within the blue zone, there is one threat if it is moving in towards the red zone -- let's say the south -- as opposed to moving parallel to that zone, to the northwest. I think I'm hearing from you, your device doesn't tell you that.  It just tells you it is still in the blue zone, so it is danger level 3 as opposed to 9 or whatever.

MR. BELLOLI:  It is not using the heading to update the threat level.  It is like Sesame Street.  Are you in the box?  Are you outside the box?  That is what the threat --

THE COURT:  It doesn't have a threat level on a scale of 10?

MR. BELLOLI:  No, no.  And even if it did, it wouldn't matter because you have to recalculate based on the compass position.

**THE COURT:** So there is a threat level in the accused device only based on its static position at any point in time.

**MR. BELLOLI:** Proximity.

**THE COURT:** Proximity?

**MR. BELLOLI:** Yes, speed.

**THE COURT:** One mile an hour versus 10 miles an hour, but it is still within the same zone. There is no differentiation in your --

**MR. BELLOLI:** Exactly. It doesn't matter if it is pointed 90 degrees, 110 degrees, whatever position on the compass. And the claim clearly differentiates between position information including distance, speed, location, altitude and compass position; i.e., the direction that you are headed. And they haven't plausibly alleged this, I mean, kind of even admitted they don't know exactly how this is done because it is not done.

I want to stress one other thing, Your Honor. This is the fourth complaint we are on now. We were in Eastern District of Texas. There was an amendment. Then we asked them to dismiss because there wasn't a venue there. They didn't. We filed a motion. Then they withdrew. Came up here. The first complaint in this case didn't even meet Form 18. And so we moved, and now we are moving again. It is just a moving target. Until they can plead plausibly that there is a recalculation of an updated threat level based on compass

position, I don't think this case should really proceed to discovery or anything because --

**THE COURT:**  I'm going to get to that in a moment, but I'm going to direct the Plaintiff to -- they will have leave to file.  It will have to be more specific in terms of satisfying all the elements.

**MR. GARZA:**  Okay, Your Honor.

**THE COURT:**  Now, with respect to indirect infringement, you know, I guess, the question is whether the Plaintiff has adequately alleged active steps to encourage direct infringement.  This would be inducing infringement on the part of the customers of the Defendant.  Is that what we are talking about?

**MR. GARZA:**  Correct, Your Honor.  Both indirect in --

**THE COURT:**  Obviously, you have to be able to allege direct infringement as credible; otherwise, you don't have indirect?

**MR. GARZA:**  Correct.

**THE COURT:**  That will rise and fall on that, but in addition you have to show knowingly inducing and specific intent to encourage.  And, I guess, if one were to assume that the Plaintiff were able to properly allege a direct claim of infringement; and you have got materials advertising the use of the drone, et cetera, et cetera, by the Defendant, why wouldn't that satisfy 12(b)(6)?

**MR. BELLOLI:**  Well, for me, Your Honor?

**THE COURT:**  Yeah.

**MR. BELLOLI:**  We will submit on the papers on indirect and willful, Your Honor.

**THE COURT:**  All right.  Now, willfulness is kind of tricky because I take it that the willfulness theory here is predicated primarily on the filing of the complaint as triggering the willful period.

**MR. GARZA:**  That is one aspect, Your Honor.  Our client also recently produced an e-mail to us in which she contacted Drone Labs -- excuse me -- Dedrone's CEO to discuss Drone Labs technology.  Now, this occurred prior to the issuing of the Application but Dedrone's CEO was at least aware of Drone Lab's technology as early as, I believe, it was November 2016.

**MR. BELLOLI:**  Your Honor, the willfulness, you need knowledge of the patent and that is an issued patent.  And here they are telling you, one, it is not in the complaint, what they just told you.  Two, knowledge of someone's product is not a predicate for willful.  You need knowledge of the patent with a charge of infringement.  This patent did not issue until, I believe, August of 2018; is that correct?

**MR. GARZA:**  That's correct.

**MR. BELLOLI:**  2018.  And the first suit here was in November of 2018.  I don't know how they are going to be able

to allege willful infringement based on the 2016 communication that doesn't reference the patent much less the application. Again, not in the complaint.

**MR. GARZA:** Even if that doesn't apply in this District, knowledge of the complaint is sufficient to satisfy at least a claim for willful infringement.

**THE COURT:** Well, there has to be knowledge of an objectively high risk.

**MR. GARZA:** Right.

**THE COURT:** And plus there are some cases that suggest that the proper thing to do is to seek an injunction and kind of employ those remedies, and damages should be allowed only when the patentee has attempted to stop the infringement activity during litigation.

I don't know if you are going to be seeking some kind of preliminary injunctive relief or something else, but isn't that an issue before you get damages -- post-complaint damages?

**MR. GARZA:** Yes, Your Honor. I believe we have pled for an injunction. If not, you know, I think -- the Defendants were well aware of the -- these patent -- at least as early of November 2016 when we originally filed in the Eastern District. And I believe that is sufficient because we also re-filed in this district in March. So that is at least a few months' knowledge of the actual patent and what was covered from that original complaint.

THE COURT:  How will you establish an objectively high risk of infringement here?

MR. GARZA:  The knowledge, Your Honor.  At least Dedrone's CEO was well aware of the technology.  I can't speak to the contents of whether our client disclosed the application during those contacts because that was not in the e-mail that was given to us.  But if it was, that also puts Dedrone's CEO on knowledge that the application was filed.  The application was filed in February of' 16.  Discussions began in late 2016.

THE COURT:  Willful can't be obtained.  Doesn't a patent have to issue before a willfulness case can be made?

MR. GARZA:  Yes.  And in this case the Defendants knew that there was an application.  During their course of due diligence, they did update their sensors.  They did update their programs.  They did file their own applications, and those applications I'm not -- I believe some of them were issued, and this was all -- they even updated their drone tracker software post -- recently, I believe.  I believe it is on drone tracker software version 3 or so.  In the course of updating their software and their -- updating any other sensors, Your Honor, they were now aware of this patent that issued in August 2018.

THE COURT:  All right.  So that goes to the awareness of the fact that the patent had issued?

MR. GARZA:  Correct.

**MR. BELLOLI:**  I'm confused, Your Honor.  I first thought he said that there were communications in 2016, and they didn't involve the patent or the application.  I haven't seen it.  It is not in the complaint.  None of this is in the complaint.  It is actually really the first time I am hearing --

**THE COURT:**  I suggest that you be more specific and lay the basis for, one, knowledge, some specific factual allegations and, two, knowingly -- knowing that you are going to have to meet the objectively high risk standard, you would be advised to put all the facts that you have in there that would so indicate.

Obviously, you don't have to prove it at this point.  I understand that.  But I think you have to have some specific allegations.  So in my dismissal of the complaint, this will give you a chance to address that question as well.

**MR. GARZA:**  Okay.  Thank you, Your Honor.

**THE COURT:**  Thirty days?  How long do you need to amend?

**MR. GARZA:**  Well, if you wouldn't mind, let me --

**THE COURT:**  Yep.

(Pause in proceedings)

**MR. GARZA:**  Yes, Your Honor, 30 days should be sufficient.

**THE COURT:**  So let's talk about what is going to

happen starting -- because I see that there is -- your case management conference is almost more lengthy than your submissions on the merits here.  I want to talk about where we go from here.

MR. GARZA:  At this point I will pass it onto my co-counsel who is going to address the CMC.

MR. MOYA:  Good afternoon, Your Honor, Mario Moya on behalf of Drone Labs.

THE COURT:  All right.  Thank you, Mr. Moya.

Apart from whether discovery starts or not -- I know that is going to be an issue in view of what I just ruled -- there is first the front-load question about preservation and the dispute about what preservation efforts there should be and what conversations there should be.  I'm very much inclined -- because I think our Court has addressed many aspects both in terms of the protective order, the handling of sensitive information, the handling of ESI and the checklist.  I don't see a need to invoke Delaware unless there are special circumstances that demonstrate that our local rules are not adequate.

So let me say at the outset that I'm very much inclined to say -- to put in place the checklist, the discovery, the stipulation order regarding discovery of ESI, patent litigation and the protective order that applies to patent information patent cases, and that, therefore, suggests that whatever the

parties have -- I don't need to go back and forth about who said what to whom -- that Roman numeral one preservation checklist is the appropriate guide to go through, and that will help to determine whether or not any sort of extra efforts need to be done so there does need to be a discussion of accessibility and what kind of software and whether stuff is preserved normally or not.

Keeping in mind, as the rules -- checklist says keeping in mind Rule 26(b)(2)(b) proportionality but I --it provides -- that's why we have this checklist.

**MR. BELLOLI:**  Your Honor, if I may be heard on that piece -- just so I understand the part right before that -- so we will now submit -- I guess, you are ordering it.  We will now submit the ESI model order for Your Honor to enter, and then the protective order as well; and I would like to make it clear that we need source code -- the optional source code provisions because they will be at issue here as well as the prosecution bar because this is -- Plaintiff purports to be a competitor of Defendant -- so we need those kind of normal safeguards.

**THE COURT:**  So those two I know you object to.  Why not?  Given that you are in competitive situations here, why wouldn't that apply?

**MR. MOYA:**  We have no objection as to the source code.  That seems obvious.  I think the question is what source code.

I think there is a possibility there is multiple source code given the number of infringing devices, and I think one of the reasons we kind of have this disagreement right now is because there wasn't an adequate meet and confer in the first place.

As to address the Court's second question about the prosecution bar, my understanding is there is a continuing application that is already on file.  I think this is a very small company.  The protective order itself already creates a little bit of confusion with respect to in-house counsel because this is a very small company involving just a handful of people.  So I think -- I just want to be careful.  If we do agree to a prosecution bar -- I understand the reasons and rationale for wanting that.  I want to make sure it only applies to litigation counsel who will have no part in the prosecution of any applications going forward.  And I do think we obviously can represent to the Court, we will adequately shield the company from any suggestion that anything that we get from the Defendants would ever be used in subsequent proceedings before the patent office.

**THE COURT:**  The main thing is -- what we don't want is somebody other than the attorneys -- you-all, litigation attorneys -- taking a look at highly confidential information; i.e., source code; that it also not be the person who is going to be prosecuting the patent.

**MR. MOYA:**  Understood.

**THE COURT:** I think that's what Section 8 does.

**MR. BELLOLI:** Exactly, Your Honor. It directly addresses the point Counsel is making. You have to have -- anyone who sees "highly confidential" or "attorneys' eyes only" source code, you can't be involved in the prosecution because then the risk is there. With your knowledge, you will be able to write claims based on proprietary information and --

**MR. GARZA:** Well, I'm sorry. If I may respond.

**THE COURT:** Yep.

**MR. GARZA:** The only ambiguity that does exist there; that there is a clear exemption for post-grant proceedings at the patent office, IPR, and those sort of things. A continuation is a little bit different. I just wanted to make sure that we had fully addressed this issue. And, you know, I think if we had just had that discussion early on, this could have been resolved. We just wanted to make sure that --

**THE COURT:** So your issue is whether in context of IPR proceedings?

**MR. GARZA:** Well, I think Section 8 of the model order --

**THE COURT:** It does not include a party representing a patent for a domestic or foreign corp including but not limited to reissued protests, ex parte's re-examination or IPR.

**MR. GARZA:** I know. My only concern was that there was this continuation application. I just wanted to make sure

that we had disclosed that and expressed our concern as to why we couldn't agree beforehand.

**THE COURT:**  Okay.  Continuing that would be part of normal patent prosecution.  It is not exempted.

**MR. BELLOLI:**  It is actually why prosecution bars exist is for continuing applications.  That is the premise --

**MR. GARZA:**  Exactly.

**THE COURT:**  We understand it does apply.

**MR. GARZA:**  Understood.

**THE COURT:**  I'm going to order that our model stipulated protective order including the two sections be in place here while the parties facilitate that.

**MR. BELLOLI:**  Your Honor, if we could -- I know you are ordering it orally now.  I would like to formally submit it.

**THE COURT:**  I would like that as a formal -- I hope you are not going to get into a dispute about that.

**MR. BELLOLI:**  No, no.  I just want to give an expert something to sign.

**THE COURT:**  Yep, I agree.  And, similarly, the stipulation order regarding ESI -- along with the checklist -- is something that is going to apply here.  So I want you-all to have a constructive meeting about preservation.  That is the first, I think, because Plaintiff has raised some concerns about perhaps this is not the typical -- and I have no idea

what kind of software and communication software is being used -- but the concern about sort of non-traditional stuff being used.

MR. BELLOLI:  I mean, our client use their computer and e-mail.  The problem I have is -- and this could lead to the next problem -- the model order that Your Honor just entered is pretty clear that e-mail is defined as both e-mail and electronic messaging, and you can't seek blanket discovery on products like the full product and the company.

THE COURT:  That's right.  It has to be a specific interrogatory request, but the preservation discussion --

MR. BELLOLI:  Understood.

THE COURT:  -- that is just a predicate.

MR. BELLOLI:  No.  I understand.  We have a litigation hold over everything.  And what we need -- and why there couldn't be a meaningful discussion for whom are going to be the custodians and all of those things -- until we got something like the model stipulation and order to know that we are not going to have blanket e-mail and blanket messaging across the entire company is --

THE COURT:  Well, and that's why by having this discussion -- so both sides understand what is the system, what is out there, what the volume looks like -- then you can assess, for instance, the scope of a proper discovery request and what the burden might be.  Without that predicate,

everybody is just arguing sort of, you know, without a factual basis; and that's the problem I see often when people come and say this is overly burdensome.  This violates proportionality.  Exactly what is the volume involved here?  What is it going to take?  Well, we don't know.  Then it is unhelpful.  I can't assess that.

So by having this discussion about where things lie, how things are organized, what the software is, how accessible it is, you lay the groundwork for that and hopefully that will help the parties --

MR. BELLOLI:  And we have that ready to go and can have that conversation forth wit.

MR. GARZA:  If I may answer one thing that was raised to this, that does kind of loop back to something that was referenced in the papers.  I do know the Court entered the ESI stipulation.  We did receive the Defendant's initial disclosures, and on that form were only disclosed five custodians of the entire company.  There is no list of their tenure at the company.  There is no list of how long they have been there.  There is just titles.  There is five people at this large company.

My fear is that the Defendants are going to be using this ESI order and the five custodian limit on specific e-mail requests as license to essentially curb our discovery rights ex ante and I do --

**THE COURT:**  I will make it clear a checklist is a checklist.  It doesn't prevent the parties from providing more detail about who these custodians are.  It does say the number of custodians from ESI will be preserved.  There ought to be a discussion of who are the custodians, how many are there, what do they have, so that it will guide -- as I said, I want this predicate information exchanged -- if it hasn't already, I want that to be exchanged -- have that discussion, and you may find that in the end that there really are only five key custodians; and they are the repositories of the relevant infringement. You may find out that is not the case.

**MR. MOYA:**  One of them is not the person who received our client's --

**MR. BELLOLI:**  Your Honor, I think we are conflating the ESI which talks about all the custodians in the company with the initial disclosures in which the parties identify their witnesses.  So we will have a conversation about who all the custodians are in the company.

**THE COURT:**  All right.  That's what I want you to have.  I want you to have that information about the lay of the land; and then when we get into discovery in earnest and if there is a problem with respect to potential burden or breadth -- over breadth, that can be done in context and just generally.

So I'm going to direct the parties to meet and confer, and

I would like you to meet and confer in person rather than just doing stuff by e-mail because that is not very productive; but pursuant to the orders that I have indicated would be applicable here.

Now, the big question now is other than initial disclosures, should there be a commencement of discovery in earnest at this point?

**MR. MOYA:** I'm sorry.  If I may respond to that, I think the fear that I have is that -- I want to be able to conduct discovery not unreasonably.  Plaintiff certainly doesn't want to look unreasonable to the Court or opposing counsel.  However, we do feel like we are in this position because we didn't get an adequate meet and confer in the first place.  The thing I was going to ask the Court is if -- we are willing to do targeted, limited discovery into these issues; and hopefully after we have this meet and confer and after we get some preliminary information that sets a label out so we can have discussions on proportionality and the scope of discovery that possibly at that point the scheduling order will be entered.  My fear of entering a scheduling order prematurely is -- we really don't know what is coming in terms of discovery disputes.  I'm afraid to put ourselves on a tight leash with certain deadlines.

**THE COURT:** Including the contentions -- the infringement and the invalidity contentions?

**MR. MOYA:**  I believe -- may I confer with my opposing counsel?

**THE COURT:**  Yep.

(Pause in proceedings)

**MR. MOYA:**  I don't think that would prevent us from bringing our infringement challenges.  We do have our opinion, and we do know that -- opposing Counsel has informed us that the Defendant does also intend to bring an *Alice* challenge to the patent itself.  We will have two rounds of pretrial motions; and, you know, I'm not sure how effective discovery will be during this period if we are going to get stone walled.  I'm not suggesting that they told us that in way but I --

**THE COURT:**  That raises two questions.  One is right now both parties have agreed to a certain schedule with respect to the claims chart, invalidity contentions, damages contentions all starting June 18.  Now that I'm dismissing the complaint with leave to amend, it may make sense for us to absorb that round first before we set -- because that may form the scope of all these contingents.

Two, then the question is while we are resolving the pleadings and as we approach the charts leading up to the claim construction, is there need to do some kind of focus discovery now in the next, let's say, 60 days as we straighten out the pleading in this case?  And if so, what would that look like?

**MR. BELLOLI:**  Your Honor, I think there wouldn't be

because then Plaintiff is using a faulty complaint as the gateway to confidential information when it didn't --

**THE COURT:**  That's why I ask what the scope is.  If they are going to ask for the source code right out of the box, that might be a problem.  Other than the questions we are talking about -- understanding the information systems, what is out there, other than the preservation and lay of the land stuff -- are there substantive things that are focused that would be appropriate in view of the fact that the pleadings still have not been settled?

**MR. MOYA:**  Understood.  My first inclination would be -- and this depends on opposing Counsel's position -- obviously you need to handle discovery before you get to that -- need to be handled to resolve early, some limited damages discovery would be appropriate.  I don't know if the Court is willing to entertain that.  I do think that could possibly bring the parties together.  If --

**THE COURT:**  Well, both parties are suggesting that absent of argument hearing, mediation or settlement conference is not likely to be fruitful.  So it sounds like we are off by a few months anyway.

**MR. MOYA:**  Worth a try Your Honor.

**THE COURT:**  If you are telling me you are willing to talk, that's one thing; but right now -- one thing you do both agree on -- is that claim construction needs to proceed

meaningfully to ER.

MR. MOYA:  Most importantly, I do think the Court telegraphed that it's going to be a fairly easy amendment on direct infringement.  That's what it sounds like.  We would be able to plead this composition and all the elements that we need to.  I know opposing Counsel's position is that our software absolutely does not do this.  I think some targeted discovery into verifying that would be really useful here.  I mean, it is very unlikely that --

THE COURT:  How about if you just had an exchange of information rather than going through the formal discovery route?  I thought you had indicated -- maybe I heard between the lines -- that you have information that would demonstrate, and maybe without the source code you could demonstrate that the product doesn't do these things.

MR. BELLOLI:  I would be willing -- let me confer with my client actually for a minute, Your Honor.

(Pause in proceedings)

MR. BELLOLI:  Your Honor, here is what we would propose; and it is subject -- we can't give a definitive timeline.  It is subject to availability and specifically availability of an engineer who resides in Germany, but this is what we would be willing to do because we don't think the actual exchange is fair or should occur before -- of technical information before they have passed that Rule 8 bar and had a

properly pleaded claim.

But if we can get the relevant engineer, who is listed on our initial disclosure as the CTO, here -- subject to availability in the United States -- to show Counsel the parts of the code in Defendant Counsel's office that definitively show that those limitations are not met, we would be willing to do that in the next 30 days subject to availability.  Again, they can't use that.  They can't take that information with them.  They can't -- again, we have to have the cart before the horse.  There needs to be a Rule 8 compliant pleading in our view before any discovery takes place; but to kind of cut to the chase, that's what we are willing to do.  We are willing to put our money where our mouth is and show them that information in our offices.

THE COURT:  That is even as they formulate their Rule 8 --

MR. BELLOLI:  Right.  But it wouldn't be a basis to -- it is going to what Your Honor said about ADR and putting cards on the table, but they need to be able to plead a claim under Rule 8 based on publicly available information.  That's how this has always worked.

MR. MOYA:  Maybe this goes back to a little bit of the prior argument.  I do think under the Doctrine of Equivalence, we did make that pleading.  We will absolutely make the pleading the next time around.  The only concern I have about a

source code offer is to the extent that there is functionality in the devices that measures direction.  A compass is defined as anything that measures direction.  That is a commonly understood definition.  There is a specialized definition that even includes other types of things like gyrocompasses, radio compasses.  There are radio sensors throughout their system.  And my only concern about getting source code is that if there is truly something that is measuring direction out there, I don't know if the source code would actually show that to us.

I would request that anything they provide us in a formal exchange of discovery be verified, so that we have some assurance that there is some accurate pleading under oath and --

**THE COURT:**  Verify you mean that what they are showing you is accurate?

**MR. MOYA:**  Yeah, attestation.  My fear is that -- I play on both sides, Plaintiff and Defense.  My fear is that we are going to be shown one thing that doesn't have what we are looking for, and the case goes away because we are going to then be --

**THE COURT:**  This is up to you.  This is for your benefit.  You can accept it or not accept it.  This is not discovery.  This is --

**MR. MOYA:**  Understood.

**THE COURT:**  -- an attempt to kind of convince you --

kind of off the record, off line -- that the accused device does not practice all of the limitations, and I would think you would have enough knowledge to know -- and if you have pointed questions about -- what about X, Y and Z -- maybe it is not a source code.  Maybe it is against -- I don't know -- other aspects of the functionality of the product that you-all can discuss.

The idea is rather than each side spending years in potential litigation only to reach the same conclusion if that, in fact, is the case.  If nothing else, you kind of know what you are up against.

MR. MOYA:  Here is how I would respond to that.  I absolutely understand what Your Honor is saying.  I think it is a generous offer, so I don't want to sound ungrateful by any means.

When you propound an interrogatory, you get to control what you are asking for.

THE COURT:  We are not precluding potential discovery. This is an attempt to sit down -- as lawyers should do more often in cases -- and see if they can kind of show some of the cards and see if they can convince the other side that they have a problem in their case or maybe you may not be convinced; but what is the downside?  It is not precluding discovery?

MR. MOYA:  If I may confer with lead counsel?

THE COURT:  Yeah.

(Pause in proceedings)

**MR. MOYA:**  That's fine, Your Honor.  Thank you.

**THE COURT:**  All right.

**MR. MOYA:**  I appreciate that.

**THE COURT:**  I appreciate that, and I appreciate that on the part of the Defendant.  I think it is useful in a case like this -- particularly where it looks like from day one battle lines are drawn, and some of the key questions may be helpful to have them looked at -- not through the lens of a very costly and time-consuming formal discovery mechanism but maybe off line.  If it doesn't resolve it, it doesn't resolve it and we move on.

What I would like to do is have you concentrate on getting your complaint -- can you do it faster than 30 days?  The quicker we move this case.  You try to arrange the meeting.  Request the CTO.  Other than the initial disclosures and the discussion I do want to have on that checklist of preservation matters, I think that is a lot to keep us occupied until the next calling of the case, which will probably be in about -- depending on what your response to their motion is -- we are probably talking 60 days out.  I should schedule a CMC which will also -- we will double that up.  If you move again on 12(b),  we will have a hearing and a status conference on that.  Or if not, we will just have a status conference to see how things are going.  And then we can set -- at that point I want

to set dates leading up to claim construction and parameters of discovery and all that.

MR. GARZA:  Thank you, Your Honor.  That sounds great.

THE COURT:  Sixty days out, subject to change if you notice a motion, one week later or earlier --

THE CLERK:  August 8, Your Honor.

THE COURT:  Pardon?

THE CLERK:  August 8.

MR. MOYA:  That works.

THE COURT:  That will be at 10:30 unless it is doubled up as a law-and-motion matter in which case it will be at 1:30.

In the meantime you helped me enter the model orders.  As I have noted, I would like you to agree on that.  Meet and confer pursuant to the checklist as a starting point with respect to preservation information and lay of the land, and I think the Court and Plaintiff will take up Defendants in their offer to make that presentation to see if they can head off this matter earlier rather than later.  And then we will see you in 60 days.

MR. GARZA:  Thank you, Your Honor.

MR. BELLOLI:  Thank you, Your Honor.

(Proceedings adjourned at 12:31 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Thursday, June 13, 2019.


_____

Marla F. Knox, RPR, CRR
U.S. Court Reporter