M. ELIZABETH DAY (SBN 177125)
eday@feinday.com
MARC BELLOLI (SBN 244290)
mbelloli@feinday.com
JEREMIAH A. ARMSTRONG (SBN 253705)
jarmstrong@feinday.com
**FEINBERG DAY KRAMER ALBERTI LIM**
**TONKOVICH & BELLOLI LLP**
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
Tel:  650.618.4360
Fax:  650.618.4368

Attorneys for Defendant
DEDRONE HOLDINGS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DRONE LABS, LLC,<br><br>            Plaintiff,<br>    v.<br><br>DEDRONE HOLDINGS, INC.,<br>and DOES 1-25, inclusive,<br><br>            Defendants. | CASE NO. 3:19-cv-01281-EMC<br><br>**DEFENDANT DEDRONE HOLDINGS, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>Judge:      Hon. Edward M. Chen<br>Date:       August 29, 2019<br>Time:      1:30 p.m.<br>Courtroom: 5, 17th Floor |

**TABLE OF CONTENTS**

I. INTRODUCTION ......................................................................................................... 1

II. ARGUMENT ................................................................................................................. 1

    A. Drone Labs Fails to Make Plausible Allegations About Infringement ..................... 1

        1. Drone Labs fails to plausibly plead the limitation that requires the accused system to "determine a base threat value of the drone based on [ ] information stored in [a] pattern database" (the green limitation) ................................................................................ 1

        2. Drone Labs fails to plausibly plead the limitation that requires "calculating an updated threat level based on the identifying information" (the first yellow limitation) ......... 2

        3. Drone Labs fails to plausibly plead the limitation that requires "re-calculating [an] updated threat level based on the position information" (the second and third yellow limitations) ....................................................................................................... 3

        4. Drone Labs fails to plausibly plead the limitation that requires "re-calculating the updated threat level based on the compass position" (the fourth yellow limitation) ............... 4

        5. No doctrine of equivalents for the calculating / re-calculating limitations which are narrowing amendments to the "counter" limitation ................................................................ 7

    B. Claim 1 of the '018 Patent is Not Subject Matter Eligible Under § 101 ................. 8

        1. Claim 1 of the '018 patent concerns collecting information about a flying object to determine whether it is a threat and nothing more ................................................................ 8

        2. *Electric Power Group* is controlling; *Finjan* is not relevant ................................. 9

        3. At *Alice* step one, Drone Labs fails to identify patent-eligible subject matter that the '018 patent is directed to ....................................................................................... 11

        4. At *Alice* step two, Drone Labs fails to identify an inventive concept .................... 13

    C. Drone Labs Should Not be Given Leave to File a Sixth Complaint Against Dedrone ................................................................................................................. 15

III. CONCLUSION ............................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Carvalho v. Equifax Info Servs., LLC*,
   629 F.3d 876 (9th Cir. 2010) ............................................................................................... 15

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F.3d 759 (Fed. Cir. 2019) .............................................................................................. 14

*Electric Power Group, LLC v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016) ........................................................................................ 9, 10

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002) ............................................................................................................... 7

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
   879 F.3d 1299 (Fed. Cir. 2018) ............................................................................................ 11

*Foman v. Davis*,
   371 U.S. 178 (1962) ............................................................................................................. 15

*Honeywell Inern. Inc. v. Hamilton Sundstrand Corp.*,
   370 F.3d 1131 (Fed. Cir. 2004) .............................................................................................. 7

*LendingTree, LLC v. Zillow, Inc.*,
   656 Fed. Appx. 991 (Fed. Cir. July 25, 2016) ....................................................................... 9

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016) ............................................................................................ 11

*Trading Techs. Int'l, Inc., v. IBG LLC*,
   921 F.3d 1084 (Fed. Cir. 2019) ............................................................................................ 14

*Univ. of Florida Research Foundation, Inc. v. General Electric Co.*,
   916 F.3d 1363 (Fed. Cir. 2019) .............................................................................................. 8

**Rules**

Rule 12(b)(6) ................................................................................................................................ 15

## I. INTRODUCTION

<u>Drone Labs cannot plead direct infringement</u>: Paragraphs 42-44 of the SAC is the sum of Drone Labs' infringement allegations that attempt to map claim 1 of the '018 patent to the Accused Devices. As discussed below, the only fact-based allegations in these paragraphs are that: (1) the Accused Devices generate and display the word "Alert" when a drone flies in a predefined area (such as the polygon in the screen shot after paragraph 44); and (2) the word "Alert" disappears when the drone leaves the predefined area. These allegations do not plausibly plead the "base threat value" limitation or any calculating / re-calculating limitations where an "updated threat level" is required based on a variety of factors.

<u>The '018 patent is not subject matter eligible under § 101</u>: Claim 1 of the '018 patent is directed to the abstract idea of collecting information about a flying object to determine whether it is a threat and has no inventive concept. This is confirmed by Drone Labs' own analysis which fails to point to anything in claim 1 beyond the abstract idea itself.

## II. ARGUMENT

### A. Drone Labs Fails to Make Plausible Allegations About Infringement

#### 1. Drone Labs fails to plausibly plead the limitation that requires the accused system to "determine a <u>base threat value</u> of the drone based on [ ] <u>information stored in [a] pattern database</u>" (the green limitation)

Drone Labs refuses to answer this gating question: What is the "base threat value" alleged in the SAC? It refuses to answer this question because the SAC never identifies a "base threat value" of any kind. Instead, Drone Labs tries to kick the can down the road by saying Dedrone is raising a claim construction issue as to this term.[1] That is not correct. Drone Labs needs to plead plausible facts that the Accused Devices "determine a base threat value of the drone based on the information stored in the pattern database." Drone Labs instead ignores this limitation in attempting to plead direct infringement but relies on the "base threat level" as an "inventive concept" when trying to save the '018 patent from dismissal under § 101.

To argue that it has plausibly pled this limitation, Drone Labs points to paragraphs 31-32

---

[1] Drone Labs fails to identify what the purported claim construction issue is or the construction it applied prior to filing this litigation.

1  and 43-44 of the SAC.  Dkt. No. 51 at 8:12-18.  But these allegations do nothing more than parrot
2  back the claim language, say that there is a "base threat value" generated by the Accused Products
3  and cite to Dedrone's marketing materials about how Dedrone's system tracks drones and has a
4  database.   There is simply no plausible, non-conclusory allegation of a "base threat value" that is
5  communicated to a user that is *based on* information stored in a pattern database.  *See* Dkt. No. 44
6  at ¶¶ 42-44.  Just the opposite.  Drone Labs' only non-conclusory allegation is that an "Alert"
7  appears when a drone enters a predefined area and disappears when the drone leaves the area.
8  *See*, *e.g.*, footnote 21 (citing to Exhibit T with the parenthetical "discussing the continuously
9  updated threat level based on the location of the detected drone – threat level changes at 2:18
10 when the drone leaves the defined area and changes again when the detected drone returns to the
11 defined area at 2:25"); *see also* footnote 22 (discussing same in connection with Exhibit Y).  But
12 Drone Labs points to this "Alert" later as an "updated" or "re-calculated" threat level,
13 highlighting that there needs to be some "base threat value" ***before*** the word "Alert" appears.
14        Drone Labs cannot just allege that Dedrone tracks drones, assesses threats, and uses a
15 database and pass Rule 8.  It needs to identify a "base threat value" that is based on "information
16 stored in [a] pattern database" with plausible factual allegations.  It has not in either the SAC or
17 its Opposition, and the Court should dismiss this action with prejudice.

18            **2.    Drone Labs fails to plausibly plead the limitation that requires
                     "calculating an <u>updated threat level</u> based on the <u>identifying information</u>"
19                    (the first yellow limitation)**

20        There must be plausible factual allegations concerning (1) "calculating an updated threat
21 level based on the identifying information," where (2) the "identifying information" comes "from
22 a transponder signal from the drone."  *See* '018 patent, claim 1.
23        With respect to the (1), Drone Labs only argues that it pled this limitation with allegations
24 that the word "Alert" appears if a drone enters a predefined area and the word disappears if it
25 leaves that same area.  Opposition at 9:10-20.  Drone Labs does not say what the "updated threat
26 level" is.  If the updated threat level is the word "Alert," then there was no base threat value (as
27 described above).  But if the word "Alert" can be the "updated threat level," then Drone Labs
28

shoots itself in the foot again because there is no allegation that this is based on "identifying information." Rather, Drone Labs only pleads that "Alert" appears and disappears based on the *location* of the drone.

To make matters worse, with respect to (2) Drone Labs fails to point to **anywhere** in its SAC where "identifying information **from a transponder signal from the drone**" is received, much less used as identifying information to calculate an updated threat level. Dkt. No. 51 at 9:21-26. Drone Labs does not reference a single paragraph in the SAC or cite to any factual basis. *Id*. Drone Labs ignores that the claim requires "identifying information from a transponder signal from the drone" to be used as identifying information in calculating an updated threat level. The word transponder does not even appear in the SAC other than when the claim language is recited, and Drone Labs fails to allege that Dedrone's Accused Devices receive a transponder signal from drones. Without that, it is impossible to plead these claim limitations, and the Court should dismiss this action.

### 3. Drone Labs fails to plausibly plead the limitation that requires "re-calculating [an] updated threat level based on the position information" (the second and third yellow limitations)

There must be plausible factual allegations concerning (1) "re-calculating [an] updated threat level based on the position information," where (2) the "position information" comprises "a distance, a location, a speed, *and* an altitude." *See* '018 patent, claim 1.

Drone Labs makes the conclusory assertion this limitation is pled (Opposition at 10:1-5) and cites to paragraph 44 of the SAC. No other argument is presented. When one reads paragraph 44, all that is alleged is that the word "Alert" appears and disappears based on whether or not a detected drone's "location" is within a predefined area. Drone Labs has no factual, non-conclusory allegation that "distance," "speed" and "altitude" are used individually (or collectively) as part of "re-calculating" an "updated threat level." Indeed, paragraph 44 at 16:12-17:2 reads in relevant part:

> Upon information and belief, the Accused Drone Detection System works in real-time by continuously monitoring and assessing the perceived threat of an identified drone. Upon information and belief, the Accused Drone Detection System receives

information from its RF sensors about the detected drone – including information such as distance, location, speed, altitude, and other captured data – and it uses the information to query the DroneDNA database to assess and evaluate the threat posed by the detected drone, process the returned results, memorize/capture the newly-queried information, and alter the user to any perceived threat.

Noticeably absent is an allegation that distance, speed or altitude is used as part of a calculation to generate an updated threat level. There is no allegation much less a plausible factual one. A simple question for Drone Labs is: Where is a factual allegation about a threat level being updated based on speed? On altitude? The answer is "there is none."

Finally, it is of no moment that these factors may be tracked by the Accused Devices; there must be a "re-calculating" of an "updated threat level" based on all required characteristics, and the SAC gives no non-conclusory allegations that this is so.

### 4. Drone Labs fails to plausibly plead the limitation that requires "re-calculating the updated threat level based on the compass position" (the fourth yellow limitation)

Claim 1 requires "determining a compass position of the drone" and then "re-calculating the updated threat level based on the compass position." Drone Labs again does not plausibly plead this limitation. Drone Labs leads with its chin and the assertion that it has pled this limitation "to the extent possible," an implicit admission it has not properly done so. Dkt. No. 51 at 10:9-10.

Drone Labs' entire argument in its Opposition is based on quotes in footnotes (*see* footnotes 7-12). But these quotes are not part of the SAC and cannot be considered in connection with this motion. Indeed, Drone Labs' Opposition claims these quotes are in Exhibit A to the SAC, which is not possible because Exhibit A is the '018 patent. It appears Drone Labs is trying to cite to Exhibits T and Y of the SAC, but again those exhibits are single frame screen shots without any of the quotes in the footnotes in Drone Labs' brief. Thus, the entire basis for Drone Labs' argument in its Opposition is not before the Court, which is incredible given that this limitation was specifically addressed in the last motion to dismiss.

Assuming Drone Labs can rely on these "footnote quotes" to overcome the Rule 8 standard, Drone Labs still fails to plausibly plead the "compass position" limitation. With regard

to compass position, Drone Labs argues two things.  First, it says "[t]he Accused Devices detect when a drone enters the area, determine the drone's compass position, and update the threat level of the drone based on its ***position***."  Dkt. No. 51 at 10:13-14.  Here, Drone Labs is purposely vague as to what it means by "position" at the end of the sentence because it knows "compass position" is not used.  Rather, as revealed in the corresponding footnotes (nos. 7-9) all that Drone Labs is pointing to is the plotting of a drone on a map when it enters a predetermined area—*i.e.*, where the drone is located on a map, which is a different kind of "position" that is dealt with in a previous limitation ("position information").  There is nothing about using a compass position (*i.e.*, the direction of a drone measured in 360 degrees using a compass) for any purpose or even that compass position is even tracked by the Accused Devices.  Drone Labs is vague about what it means by updating of threat level based on "position" because it knows based on reviewing the Dedrone source code with Drone Labs' CTO that compass position or even the "direction" of a drone is in no way used for generating any kind of alert or threat level.  Only the physical location of the drone is used in determining whether to generate an "Alert."

Second, Drone Labs argues "the yellow line showing the direction of a detected drone is a prime example of the Accused Drone Detection System detecting a drone, monitoring the direction of travel of the detected drone, and displaying the different threat levels ***based on the information obtained from the drone***."  Dkt. No. 51 at 11:3-6.  Here again, Drone Labs purposely does not say that tracking "direction" (which is not tracking compass position) is used to change a threat level, just that a threat level is "based on [some unidentified] information from the drone."  *Id.*  Drone Labs is again being cagey and not clearly pleading that "direction" or "compass position" is actually used to re-calculate the threat level as required by the claim.  It does not do this because it knows from having reviewed the source code and speaking to the CTO of Dedrone that would simply not be true.

In paragraph 44 of the SAC Drone Labs alleges (without support) that a yellow line tracking the flight path of a drone is used to re-calculate a threat level.  Dkt. No. 44 at ¶ 44.  Even if the Court construes this allegation in the light most favorable to Drone Labs, the allegation

nevertheless is just as conclusory as in the First Amended Complaint.  The allegations in the SAC only aver that the word "Alert" appears when a drone enters a predefined area (and that the word disappears when it leaves).  Drone Labs does not aver that the "Alert" has anything to do with "compass position" or is re-calculated based on it, nor does it supply any facts to plausibly infer such functionality.  Put another way, a yellow line showing the direction of a drone (such as in the picture following ¶ 44) does not show or plead that "direction" is used to re-calculate an updated threat level.  Drone Labs' allegations lack any factual support that any purported threat level is updated or re-calculated following a change in "compass position" or even direction.  *See* Dkt. No. 44 at ¶ 44 and footnotes 20 and 23.  The "yellow line" and direction can be tracked all day and no infringement will occur unless a threat level can be re-calculated based on direction or that line.  That simply does not occur and there are no fact-based allegations to the contrary.

What results from Drone Labs' cageyness in its Opposition is a failure by Drone Labs to point to anything that resembles "compass position" being used as a factor to re-calculate anything, much less a threat level.  This is an undisputed claim element that is simply left unaddressed even though the Court specifically ordered that it be addressed:

> The motion to dismiss the claim for direct infringement is granted.  However, Drone has leave to amend.  The amendment should contain more specific allegations on "compass position" and the recalculation of the updated threat level based on the compass position.

Dkt. No. 37 at 1:18-20.

If anything, Drone Labs' arguments have regressed with regard to "compass position" and the further requirement that it be used to "re-calculat[e]" an "updated threat level."  Last time, in the First Amended Complaint, Drone Labs pled the "compass position" and "re-calculating" limitations but in a conclusory fashion with no support.  This time in its Opposition, Drone Labs does not even point to passages from the SAC to support its argument in its Opposition.  Drone Labs refuses to affirmatively state that there is a re-calculating of a threat level based on "compass position" or even the "direction" of the drone because it knows that the Accused Devices do not operate in a way that

infringes the '018 patent.

Finally, on page 6 of its brief, Drone Labs incorrectly states that "Dedrone is asking the Court to determine the meaning of … 'compass position.'" Dkt. No. 51 at 6:17-19. Dedrone is not. No matter how this term is viewed—*i.e.*, as an actual "compass position" (which Drone Labs wants to ignore) or simply the "direction" of a drone (Drone Labs' incorrect position)—the result is always the same. There is no fact-based allegation that either is used to re-calculate an updated threat level because Dedrone's software and system do not work that way which Drone Labs' review of the source code confirmed.

### 5. No doctrine of equivalents for the calculating / re-calculating limitations which are narrowing amendments to the "counter" limitation

This issue should be moot given that Drone Labs does not identify a single element in its Opposition where it relies on the doctrine of equivalents. But to foreclose Drone Labs from arguing the doctrine of equivalents at the hearing, the following shows why Drone Labs cannot rely on the doctrine of equivalents for any of the calculating / re-calculating limitations.

Amendment-based estoppel applies to an amended claim limitation if the "amendment [was] made to secure the patent and the amendment narrow[ed] the patent's scope." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002). Thus, to trigger estoppel, an amendment must be (1) narrowing and (2) made for purposes of patentability. *Id.*

Drone Labs cannot and does contest the following: (1) the calculating / re-calculating limitations were added by amendment and narrow the "counter" limitation because they are all "instructions" that the previously claimed counter performs; and (2) the calculating / re-calculating limitations were added to the "counter" limitation to overcome prior art and a rejection by the Patent Office. *See* Exhibit A (Dkt. No. 45-2) at DEDRONE0000033-36; DEDRONE0000044-55; DEDRONE0000059-61; DEDRONE0000063-64; DEDRONE0000073-85; DEDRONE0000127-136. Accordingly, prosecution history estoppel applies and there is "a presumptive surrender of equivalents as to <u>the entire limitation</u>." *Honeywell Inern. Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1144 (Fed. Cir. 2004) (citing *Festo*, 535 U.S. at 740-41) (emphasis added). Thus, Drone Labs cannot assert there is a "counter" that is programmed

any other way than in strict accordance with the calculating / re-calculating limitations. Equivalents are not available.

### B.  Claim 1 of the '018 Patent is Not Subject Matter Eligible Under § 101

#### 1.  Claim 1 of the '018 patent concerns collecting information about a flying object to determine whether it is a threat and nothing more

Drone Labs tries to gussy-up claim 1 in its Opposition with a concept and limitations that are nowhere to be found in the actual claim. It is therefore important to reorient what claim 1 is directed to and the actual limitations in the claim. Viewed holistically—as one must in a § 101 analysis—claim 1 is about collecting information about a flying object to determine whether it is a threat and nothing more.

Claim 1, first half (4:7-18): The first half of the claim is about identifying a flying object (a drone) with a generic "scanning system," determining whether it is a "friend or foe," assigning a "base threat level" to the drone and then storing this information in a database. '018 patent at 4:7-18. This is no more than what humans have done for thousands of years observing flying objects and making assessments of the threatening nature of those objects with their eyes and brains. Taking fundamental human behavior and claiming to "do it on a computer" without an actual improvement to how the computer functions is not eligible subject matter. *See, e.g.*, *Univ. of Florida Research Foundation, Inc. v. General Electric Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019) ("On its face, the '251 patent seeks to automate 'pen and paper methodologies' to conserve human resources and minimize errors. This is a quintessential 'do it on a computer' patent: it acknowledges that data from bedside machines was previously collected, analyzed, manipulated, and displayed manually, and it simply proposes doing so with a computer. We have held such claims are directed to abstract ideas.").

The '018 patent is even worse than the "quintessential 'do it on a computer' patent" because the '018 patent readily acknowledges that prior machines existed for tracking and identifying flying objects to determine if they were "friend or foe." '018 patent at 1:12-15 ("Prior to embodiments of the disclosed invention, IFF systems used a two-channel system, with one frequency (1030 megahertz) used for interrogating signals and another (1090 megahertz) for the

1   reply."). Moreover, it is in the realm of general human experience that such systems existed
2   many decades ago for use during world wars.
3         All the '018 patent purports to do in the first half of the claim is the same basic function as
4   prior systems using a computer in the field of use of unmanned drones.  Simply saying "do it on a
5   computer" is not eligible (as noted above) and field of use restrictions (confining existing
6   technology to a certain field like drones), does not make it subject matter eligible either.  *Bilski v.*
7   *Kappos*, 561 U.S. 593, 612 (2010) (explaining that "limiting an abstract idea to one field of use . .
8   . d[oes] not make the concept patentable"); *LendingTree, LLC v. Zillow, Inc.*, 656 Fed. Appx.
9   991, 995 (Fed. Cir. July 25, 2016) ("We also know that a claim directed to an abstract idea is not
10  eligible merely by limiting the invention to a particular field of use or technological
11  environment.").  Claim 1 covers nothing more than "do what prior systems and humans have
12  done, but use a computer and do it to identify drones."  That is not patent eligible subject matter
13  by any measure.
14        <u>Claim 1, second half (4:19-38)</u>:  The second half of the claim adds nothing with respect to
15  eligibility.  It just advises to use computer "instructions" to update / re-calculate a "threat level"
16  based on numerous observable factors concerning the drone like speed, altitude, position, etc.
17  '018 patent at 4:19-38.  The information is then stored in a database.  *Id.*  This is again claiming
18  fundamental human behavior and requiring that it be done "on a computer":  observe a flying
19  object with one's eyes, make a threat assessment with one's brain based on what the object is
20  doing (e.g., speed, altitude), and store that memory in one's brain.
21        "Do it on a computer" and "observe drones (as opposed to other flying objects)" is not
22  patent eligible subject matter.  It cannot be disputed that claim 1 of the '018 patent concerns
23  collecting information about a flying object to determine whether it is a threat and nothing more.
24        **2.**     ***Electric Power Group* is controlling; *Finjan* is not relevant**
25        As set forth in Dedrone's opening brief (Dkt. No. 45 at 14:5-15:5, 16:2-18:3), there is no
26  colorable distinction between the ineligible claims in *Electric Power Group* and claim 1 of the
27  '018 patent for purposes of § 101 eligibility.  *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d
28

1350, 1353-55 (Fed. Cir. 2016).

The only place Drone Labs seeks to distinguish *Electric Power Group* is at pages 20-21 of its Opposition. Dkt. No. 51 at 20:19-21:5. Moreover, the only distinction that Drone Labs draws is that the '018 patent deals with tracking drones, while the claims in *Electric Power Group* concerned "performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results." 830 F.3d at 1351. This is no distinction at all—both patents involve observing an object (a drone or a power grid), assessing what that object is doing and communicating that information to a user in some form (a threat level for the '018 patent and whether the power grid is stable in the case of *Electric Power Group*). These are the same basic concepts done "on a computer" that were done without a computer previously. Drone Labs also does not attempt to distinguish *Electric Power Group* analytically, nor can it. The analysis of that controlling case is equally applicable here.

Drone Labs asserts that the '018 patent "does more than just gather and manipulate data to display to a user of a system" (Dkt. No. 51 at 21:3-4), but Drone Labs fails to identify any way in which this statement is accurate. Just the opposite. Drone Labs says the '018 patent solves the problem of "how to detect a variety of drones/UAVs of unknown provenance in modern airspace" with "claimed rules for the repeated gathering, processing and evaluation of real time data to obtain a threat value that is both saved to a database for later use and also displayed to a user to alert of an encroaching drone." Dkt. No. 51 at 21:5-11. Drone Labs' own statements here are problematic to Drone Labs' eligibility position. There is nothing in the claims about "real time" (beyond the generic use of a computer) and such statements merely confirm this is a system for nothing other than monitoring drone behavior, creating an alert based on that behavior and saving the data. Again, no different than what humans can do with their eyes and brains in real time.

The two cases on which Drone Labs relies most heavily are *Finjan* and *McRO*. But these cases are distinguishable both factually and analytically. Whereas the claims in *Electric Power Group* and the '018 patent are about porting over fundamental human tasks to a computer, *Finjan* and *McRO* were about improving the functioning of computers themselves with new techniques.

1   In *Finjan*, the prior art method for identifying computerized viruses was to search for previously-
2   identified viruses. *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299, 1303-05 (Fed. Cir.
3   2018). This method was improved by the *Finjan* patents by scanning for viruses based on a
4   "security profile" with "information about *potentially* hostile operations produced by a 'behavior-
5   based' virus scan." *Id.* (emphasis in original). Thus, the system was improved because no longer
6   did the computer system just look for known viruses, it could scan for potentially hostile viruses
7   with a new computerized technique using a behavior-based security profile. This is in stark
8   contrast to the '018 patent which says "do what prior systems did, but do it with respect to
9   drones." Again, field of use restrictions do not make claims eligible. *Bilski*, 561 U.S. at 612.
10  Moreover, there is no indication a human can do computer virus scanning at any level, but a
11  human can observe the activities of a flying object with its own eyes.

12      *McRO* concerned computerized facial animation, a fundamentally computerized process
13  unlike a human's ability to observe a flying object. *McRO, Inc. v. Bandai Namco Games Am.*
14  *Inc.*, 837 F.3d 1299, 1303-08, 1313-16 (Fed. Cir. 2016). Even though a computerized process,
15  the prior art techniques in *McRO* required the animator to subjectively identify problematic
16  sequences and manually fix them. *Id.* The novel solution involved rules for the computer to
17  follow based on relationships between phonemes and weighting phoneme is specific ways in
18  order to automate the previously manual process of fixing problematic sequences subjectively.
19  *Id.* This solution improves the computer, makes it operate better and eliminates the problematic
20  sequences. The '018 patent does nothing more than move human behavior onto a computer.

21              **3.      At *Alice* step one, Drone Labs fails to identify patent-eligible subject
                         matter that the '018 patent is directed to**
22
23      Dedrone has addressed much of both *Alice* steps one and two above and in its Motion.
    Here, Dedrone responds to additional arguments made by Drone Labs.
24
25      Drone Labs never directly addresses what claim 1 is "directed to" at *Alice* step one. It
26  skirts the issue because the claim is fundamentally directed to collecting information about a
27  flying object to determine whether it is a threat, and no argument can change the nature of the
28  claim. The closest Drone Labs comes to taking a position on what claim 1 is "directed to" at

1  *Alice* step one is at 16:24-17:4 of its Opposition:

2  
3  
4  
> The critical challenge that the patent attempts to solve is how to implement a novel IFF system that (i) continuously identifies new UAV/drone threats without relying upon a two-channel transponder and assigns a base threat value, (ii) assesses the threats the objects pose (if any), (iii) displays the perceived threats to a user, and (iv) ensures that the observed information is stored in a database for later use.

5  Dkt. No. 51 at 16:24-17:4.

6        Parts (ii), (iii) and (iv) are all activities a human can do instead of a computer—observe a
7  drone, determine if it is a threat, and remember it for future use.  Parts (ii), (iii) and (iv) are all
8  engrained in the abstract idea of collecting information about a flying object to determine whether
9  it is a threat.  Rather than reject Dedrone's argument that claim 1 is directed to the abstract idea of
10 collecting information about a flying object to determine whether it is a threat, Drone Labs
11 repackages and reiterates the abstract idea identified by Dedrone.  Drone Labs thus agrees that the
12 '018 patent fails *Alice* step one because it takes a fundamentally abstract concept and says "do it
13 on a computer."

14       Part (i) of Drone Labs' identification of what claim 1 is "directed to" fairs no better.  The
15 act of "continuously identif[ying] new UAV/drone threats . . . and assign[ing] a base threat value"
16 is part and parcel of the abstract idea of collecting information about a flying object to determine
17 whether it is a threat.  Again, Drone Labs is confirming that this is human behavior ported to
18 computers.

19       In part (i), Drone Labs tries to say the claim is directed to drone tracking "without relying
20 on a two-channel transponder."  *Id.*  Drone Labs then spends much of its argument harping on
21 issues related to two-channel transponders.  This is a red herring as it has nothing to do with the
22 actual subject matter of claim 1, which does not concern or address any purported problem posed
23 by two-channel transponders.  Indeed, the only physical component in claim 1—other than a
24 computer (which has a timer, counter and microprocessor)—is a "scanning system."  The patent
25 is clear that the scanning system can be any known system for identifying flying objects,
26 including radar.  *See, e.g.,* '018 patent at 1:33-65 ("The scanning system further comprises a radio
27 frequency detection system that searches for a radio frequency that is within a radio frequency

28

threat range."). Thus, there is nothing in the claim about moving from a purported two-channel system to something else or how an issue with a two-channel system is overcome by the subject matter in claim 1. And, even if there was such subject matter in claim 1, it does not change the fact that claim 1 is still solely directed to collecting information about a flying object to determine whether it is a threat, and nothing more. The claim has two physical components—a computer and a scanning system (which can be radar)—and there is absolutely nothing in the claim about overcoming any issue with some two-channel system.

While Drone Labs chides Dedrone for an "over-simplistic analysis of Plaintiff's patent" (Dkt. No. 51 at 18:21), Drone Labs is unable to identify anything *in claim 1* that is directed to anything beyond collecting information about a flying object to determine whether it is a threat.

### 4. At *Alice* step two, Drone Labs fails to identify an inventive concept

Drone Labs' identification of the purported inventive concept confirms that the '018 patent is about nothing more than collecting information about a flying object to determine whether it is a threat:

> While it is true that observable physical measurements about a UAV/drone are freely observable (and measureable by prior art), the inventive concept presented by the '018 Patent is the collection, processing, threat-evaluation, and memoization [sic] of all of those types of observable factors (and assessed threat values) into a "pattern database" so that UAV threats can be assessed without the benefit of a predetermined inter-operable transponding signal in use by the drone itself.

Dkt. No. 51 at 23:3-8.

Here, Drone Labs admits that the patent simply takes "freely observable" information that is "measurable by prior art," collects that information to see if a drone is a threat, and then stores that information in a database. Again, Drone Labs is confirming there is nothing in this claim beyond human behavior ported over to a computer. It is ironic that Drone Labs claims that assessing "threat values" is part of an inventive concept when it cannot point to such values in its infringement allegations. Everything in Drone Labs' articulation of the purported inventive concept up until "without the benefit of …" is a rephrasing of the abstract idea.

With respect to the final part of Drone Labs' view of the purported inventive concept —

1  "without the benefit of predetermined inter-operable transponding signal in use by the drone itself"— this is not in the claim.  Again, there are two physical components *in the claim*—a computer and a scanner (which can be a radar).  These are known devices being used in conventional ways:  to track flying objects (drones) and process information about those flying objects.  Drone Labs cannot conjure an inventive concept out of something that is not in the claim and is mentioned in passing in the specification.  *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) (holding that "the specification cannot be used to import details from the specification if those details are not claimed"); *Trading Techs. Int'l, Inc., v. IBG LLC*, 921 F.3d 1084, 1095 (Fed. Cir. 2019) ("Eligibility depends on what is claimed, not all that is disclosed in the specification.").  Indeed, the only place that two-channel systems are discussed in the specification is at 1:12-18 and there is no identification about problems with using two-channels, just that prior systems have not purportedly "kept up with the proliferation of drone technology in the United States" (a non-sequitur):

> Prior to embodiments of the disclosed invention, IFF systems used a two-channel system, with one frequency (1030 megahertz) used for the interrogating signals and another (1090 megahertz) for the reply.  However, this system has not kept up with the proliferation of drone technology in the United States.

'018 patent at 1:12-18.  There is no indication anywhere that any purported issue with a two-channel architecture is solved by *the claims* of the '018 patent.  Just that two-channel systems were used "prior to" the purported invention.  The purported solution that is claimed is tracking drones with a scanning system and a computer to assess threat levels, which is little more than the abstract idea of collecting information about a flying object to determine whether it is a threat.

Drone Labs ends with a remarkable statement given its scant infringement allegations.  Drone Labs says that claim 1 recites "threat level assignment for a detected drone [that] is 'recursively updated' using a specific and unique manner of ordering steps that, when considered alone, may seems unremarkable, but, when considered in an ordered combination, certainly presents a novel inventive concept."  Dkt. No. 51 at 25:16-29.  What is so remarkable is that Drone Labs claims that claim 1 of the '018 patent has steps in a "specific and unique manner" that present an inventive concept, yet Drone Labs cannot articulate an inventive concept and

cannot point to the use of many of the steps required for infringement.

There is no inventive concept, and Drone Labs fails to identify one. Moreover, there are no claim construction issues or factual issues with respect to subject matter eligibility as Drone Labs fails to identify any.

### C. Drone Labs Should Not be Given Leave to File a Sixth Complaint Against Dedrone

The SAC is Drone Labs' **fifth** complaint asserting that Dedrone infringes the '018 patent—two of the five were filed in the Eastern District of Texas (Case No. 1:18-cv-608) and the other three in this Court. Drone Labs failed each time.

A court "may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party … [and] futility of amendment.'" *Carvalho v. Equifax Info Servs., LLC*, 629 F.3d 876, 893-93 (9th Cir. 2010) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). There are many reasons to deny leave at this point. Drone Labs provided no explanation why further amendment would not prove futile. Dedrone is prejudiced by having to defend against bogus allegations five times already, including having to move to dismiss in an objectively improper venue (the Eastern District of Texas). There have been five prior failures, which certainly constitutes "repeated failure to cure deficiencies by amendments previously allowed." Finally, it has been nine months since Drone Labs filed the first of the five complaints in Texas and these matters are now at the point of undue delay by Drone Labs in stating a claim and bad faith (Drone Labs continues its claims despite having source code confirmation that there is no infringement). No leave should be granted.

### III. CONCLUSION

For the foregoing reasons and the reasons in Dedrone's Motion, the Court should dismiss this suit with prejudice under Rule 12(b)(6).

Dated:  August 8, 2019

**FEINBERG DAY KRAMER ALBERTI LIM TONKOVICH & BELLOLI LLP**

By:  */s/ Marc Belloli*
        Marc Belloli

*Attorneys for Defendant
Dedrone Holdings, Inc.*